J-S42031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: B.R.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 949 WDA 2022 |

Appeal from the Order Entered June 10, 2022
In the Court of Common Pleas of Bedford County Orphans' Court at
No(s): No. 8 AD for 2022

BEFORE: BOWES, J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED: JANUARY 13, 2023**

T.H. ("Mother") appeals from the June 10, 2022 order of the Court of Common Pleas of Bedford County Orphans' Court ("orphans' court"), which granted the petition filed by Bedford County Children and Youth Services ("BCCYS"), terminated Mother's parental rights to her son, B.R.B. ("Child"), born in March 2021, pursuant to 23 Pa.C.S. § 2511(a)(8) and (b), and changed the permanency goal to adoption.[1] After careful review, we affirm the termination decree and dismiss the appeal from the goal change order as moot.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] On June 10, 2022, the orphans' court also issued an order terminating the parental rights of Child's father, B.G. ("Father") pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). Father has not filed an appeal.

Mother has a lengthy history of placement with BCCYS as a juvenile, with numerous hospitalizations for mental health issues and instability; the first-born of her two other children, W.D.H., was placed in foster care one day after his birth in 2016 by emergency protective order due to Mother's mental health issues, homelessness, assaultive and erratic behavior, and subsequent involuntary commitment to psychiatric hospitalization. Petition for Involuntary Termination of Parental Rights/Change of Goal to Adoption, 3/31/22. Mother's second-born child, N.R.X, was placed in a foster home in November 2017, on the day after her birth, by an emergency protective custody order for identical reasons. *Id*. Mother's parental rights were terminated as to W.D.H. and N.R.X. in February 2018 and June 2019 respectively. *Id*.

BCCYS took custody of Child in March 2021 upon his discharge from the hospital following his birth, and he has remained in the same foster home since that time. A shelter care order was entered and BCCYS filed a dependency petition and petition for a finding of aggravated circumstances, pursuant to 42 Pa.C.S. § 6341(c.1) as to Mother,[2] and the orphans' court, by

---

[2] Section 6341(c.1) of the Juvenile Act provides:

> If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or

*(Footnote Continued Next Page)*

July 7, 2021 order found sufficient evidence to enter such finding and direct that no efforts be made to preserve the family and reunify Child with his parents. Mother appealed the July 7, 2021 order, which was affirmed by this Court on February 14, 2022. *In re: B.B.*, No. 886 WDA 2021, (Pa. Super. filed February 14, 2022), unpublished memorandum.[3]

On March 31, 2022, BCCYS filed an Involuntary Termination of Parental Rights petition and on April 8, 2022, BCCYS filed a Petition for Change of Permanency Goal. Following a hearing held on June 9, 2022, the orphans' court entered an order involuntarily terminating both Mother's and Father's

_____

> eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as required in section 6351(e)(3) (relating to disposition of dependent child).

42 Pa.C.S. § 6341(c.1). "Aggravated circumstances" exist, *inter alia*, where the parental rights of the parent have been involuntarily terminated with respect to a child of the parent. 42 Pa.C.S. § 6302.

[3] In her appeal, Mother asserted that reunification was warranted because she had demonstrated a willingness to cooperate with BCCYS and had shown progress in the short period of time in which she had been asked to engage with recommended services, including having addressed her substance abuse. Our Court examined the record and concluded that Mother had demonstrated only "very basic parenting skills, having only cared for [Child] under supervised conditions, that instability of housing remains an issue, and that Mother's mental health issues continue with only minimum efforts to address them." *In re: B.B.*, No. 886 WDA 2021, (Pa.Super. filed February 14, 2022), unpublished memorandum at 14.

Our Court emphasized that although Mother has promised to continue her efforts to learn parenting skills, address her substance abuse and mental health issues, and "overcome her other life struggles," the focus of the Juvenile Act is on a child's safety, permanence, and well-being, and these factors must take precedence over a parent's promises to do better. *Id*.

parental rights and an order changing Child's permanency goal to adoption. Mother filed a timely notice of appeal on August 16, 2022.

On appeal, Mother asserts first, that the orphans' court erred in granting the termination petition because the conditions leading to placement no longer exist, and second, that the court erred when it denied her request to hold the record open for additional witnesses, because they could have offered beneficial testimony. Mother's Brief at 5.

Our standard of review in appeals from orders terminating parental rights is deferential:

> The standard of review in termination of parental rights requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (citation omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to

a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id*. (citation and internal quotation marks omitted).

Here, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(8) and (b), which provide as follows:

> (a)  General rule.—The rights of a parent in regard to a child may be terminated after a petition is filed on the following grounds:
>
> ---
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, and 12 months or more have elapsed since the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> ---
> (b)  Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(8), (b).  Under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights, focusing initially on the conduct of the parent; only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child.  *In re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005).

To satisfy Section 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least 12 months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Unlike other subsections, Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the child. *In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). "[T]he relevant inquiry" regarding the second prong of Section 2511(a)(8) "is whether the conditions that led to the removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the Section 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa. C.S. § 2511(b).

Although Section 2511(a)(8) generally focuses on the behavior of the parent, the third prong of Section 2511(a)(8) specifically "accounts for the needs of the child." *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*). This Court has recognized that "the application of [Section 2511(a)(8)] may seem harsh when the parent has begun to make progress

- 6 -

toward resolving the problems that had led to the removal of her children."

***In re Adoption of R.J.S***., 901 A.2d 502, 513 (Pa. Super. 2006).

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [18] months, in which the complete the process of either reunification or adoption for a child who has been placed in foster care.

***Id***.

Child was removed from Mother's care in March 2021 and the termination hearing took place in June 2022, well over the 12 month requirement set forth in Section 2511(a)(8). At the hearing, BCCYS presented evidence to demonstrate that the conditions which led to Child's placement continue to exist. Valene Kinsey, the BCCYS caseworker assigned to Mother and each of Mother's three children, testified that for a period of approximately eight weeks after Child was born, up until the July adjudication hearing, Mother had weekly supervised visits with Child for one hour, but Mother needed a lot of instruction for even basic care of Child. N.T., 6/9/22, at 13. The caseworker confirmed that Mother's mailing address was in Saxton, Pennsylvania at her mother's house, but stated that she had spoken with Mother's mother about three months prior to the hearing, in early March 2022, and was told that she and her daughter had had a falling out, and Mother had

gone to Somerset, Pennsylvania. *Id*. At 17.  The caseworker further testified that she spoke to another family member, also in early March, who told her that Mother was residing in Johnstown, Pennsylvania; however, the caseworker stated that Mother came to her office on March 21, 2022 and told her that she was living at her mother's house. *Id*.  Mother testified, contrary to the testimony of the caseworker, that she had been residing at her mother's home for almost a year, and that she was going to begin to make agreed-upon rent payments to her mother. *Id*. at 24.

At the dependency and aggravated circumstances hearing held in July, 2021, Mother had testified that she was about to take the test to obtain a driver's permit, in an effort to reinstate her suspended driver's license; however, at the June 9, 2022 hearing, nearly a year later, she reported that although she had recently purchased a car, she had not yet obtained her driver's permit.  N.T., 7/6/21, at 47; N.T., 6/9/22, at 28.

Ms. Kinsey, the BCCYS caseworker also testified at the July 2021 hearing; she indicated that at that time, BCCYS did not know where Mother was living, and neither Mother nor Father had contacted BCCYS to provide this information.  N.T., 7/6/21, at 13.   The caseworker testified that Mother was supposed to be participating in outpatient mental health treatment through Development and Behavioral Health Services ("DBHS") and participating in Family Preservation Service, but she reported that Mother's counselor had not been successful in scheduling appointments with Mother, nor had the caseworker been able to obtain records from Pyramid Healthcare ("Pyramid")

with regard to the group drug counseling Mother indicated she was receiving. *Id*. at 23. As well, at the 2021 hearing Mother acknowledged difficulties she had encountered in scheduling outpatient mental health counseling appointments through DBHS, attributable to her problems with transportation and lack of a functioning telephone. *Id*. at 38-39. Mother testified about her drug and alcohol providers at Pyramid, and when she was reminded by counsel that in addition to being clean from drugs, BCCYS required that she participate in mental health services, Mother stated that she was willing to do whatever it took to bring Child home. *Id*. at 32-33, 44.

At the 2022 termination hearing, Mother asserted that she was no longer in drug or alcohol counseling, because her counselors at Pyramid believed that she no longer required treatment, and that for the past three months, she had been undergoing mental health treatment from two individuals she identified as Pam Wright and Dr. Dauphin, from MHMR in Bedford. N.T., 6/9/22, at 28, 31. Conversely, the caseworker from BCCYS testified that she had no records to indicate that Mother was treating at MHMR, and stated that Mother "has not participated" in any of BCCYS's recommended services and that she did not have a signed release from MHMR. *Id*. at 17-18. When asked by counsel why she had not been in contact with BCCYS for a number of months, Mother responded that "she didn't feel that there was any point," because "[BCCYS] was going to get what they wanted anyway." *Id*. at 34. Mother responded to counsel's question as to what she wanted to see happen to Child by stating, "Well, I already know that [BCCYS] is gonna get what they want, but I would

like to go with an open adoption," explaining that she wanted to be able to see Child on holidays and birthdays; Mother stated, "I at least want to have at least one of my kids in my life." *Id*. at 35. Later in the hearing, on cross-examination from Child's guardian *ad litem*, Mother indicated that although she would rather have Child at home with her, she did not believe that she was going to achieve that result; in response to questions as to why she had not notified BCCYS of her alleged discharge from a drug/alcohol program or her participation in mental health treatment with Pam Wright, she responded that BCCYS already knew of the treatment, that she had signed releases before and did not believe she should have to do so again. *Id*. at 36-39.

At the conclusion of the termination hearing, the orphans' court placed its reasoning on the record, noting the BCCYS's caseworker's lengthy involvement with Mother and her children and her testimony regarding her ongoing concern with Mother's unresolved mental health issues and overall lack of stability especially in the areas of housing and employment. N.T., 6/9/22, at 49. Emphasizing its unique position to evaluate the credibility of witnesses, the orphans' court expressed its overall concern regarding Mother's testimony that she had been successfully discharged from drug and alcohol treatment, commenced mental health counseling with a new counselor, and made other progress toward her goals; the orphans' court stated, "[i]t is inconceivable to the [c]ourt that if [Mother] actually made progress in these areas that she wouldn't so advise [BCCYS] who has custody of [Child]. *Id*. at 50. The orphans' court noted that Mother offered no documentation to

substantiate her claims and reiterated its particular concern with Mother's lack of cooperation with BCCYS throughout the duration of this case. *Id*. The orphans' court concluded that reunification was not, in fact, imminent and that the conditions that led to the removal of Child continue to exist. *Id*.

The orphans' court further reasoned that the third component of the analysis under Section 2511(a)(8), i.e., whether termination would best serve the needs and welfare of the child, had clearly been met, based upon the testimony of the caseworker regarding the strong bond that has been established between Child and his foster parents and the fact that Child is flourishing within the family unit. *See Id.*, at 9, 14.

Upon review, we find no abuse of discretion in the orphans' court's determination that the three components necessary to satisfy Section 2511(a)(8) have been satisfied. Mother asserts, with no corroboration, that she has, in the three months prior to the termination hearing, begun to address the mental health issues that have plagued her throughout her life. As noted above, however, we are constrained from considering remediation efforts initiated by a parent in the period subsequent to the filing of a termination petition. Sadly, Mother simply did not demonstrate credible evidence of progress toward remedying the conditions that gave rise to Child's placement as of the date the petition was filed.

Mother further argues that the orphans' court abused its discretion in denying her request that the record remain open so that she might obtain testimony from the mental health service providers with whom she has treated

for the past three months. We do not agree. Even if the orphans' court were permitted to consider this evidence relating to the period after BCCYS filed its petition, Mother was served notice of the hearing on April 6, 2022 and, as noted by the orphans' court, had ample time to gather any corroborating evidence, whether in the form of witnesses or documentation. *See* Orphans' Court Opinion, 8/19/22, at 4. Mother failed to do so, and she likewise made no attempt to communicate with BCCYS regarding the progress she asserts she had made.

We must turn then to subsection (b) of Section 2511, which requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation and quotation marks omitted). Our Supreme Court has made clear that Section 2511(b) requires the orphans' court to consider the nature and status of the bond between a parent and child. *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). In addition to a consideration of the bond, if any, between a parent and child, the orphans' court may equally emphasize the safety needs of the child, and "should also consider the intangibles, such as the love, comfort, security and stability the child might have with the foster parent." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). Our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children

- 12 -

are in a pre-adoptive home and whether they have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268.

Here, the orphans' court found no evidence of a bond between Mother and Child, noting that the sole contact Mother has had with Child consisted of the eight visits that occurred in the weeks immediately following his birth. N.T., 6/9/22, at 53. The orphans' court found credible the testimony of the BCCYS caseworker, who sees Child at least once every month, that Child looks to the foster parents, who plan to adopt him, for love and comfort and has found stability in the foster home. ***Id.*** BCCYS' caseworker testified that Child thinks that he was born into his foster family, lights up when his foster father comes into the room, and is easily comforted by his foster mother. ***Id***. at 14. The orphans' court determined that failing to grant termination and removing Child from his foster home would have an extremely detrimental effect on Child, who has established a strong bond with his foster parents. ***Id***. at 53. Child's guardian *ad litem* agreed, and testified as to her belief that, despite Mother's claims of progress, BCCYS had established Mother's failure to meet her goals and that termination of parental rights would best serve Child's needs and welfare. ***Id***. at 42-43.

In sum, the record reflects that the orphans' court appropriately considered the effect of termination of Mother's parental rights to Child pursuant to Section 2511(b), and did not abuse its discretion or commit an error of law in determining that termination of Mother's rights is in Child's best interest.

Based on the foregoing, we affirm the decree involuntarily terminating Mother's parental rights to Child pursuant to Sections 2511(a)(8) and (b). In her brief, Mother does not present any argument challenging the order changing Child's permanency goal to adoption, precluding our review. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) (claim waived where appellate brief fails to provide any discussion of the claim with citation to relevant authority or fails to develop issue in any other meaningful fashion capable of review). In any event, our affirmance of the involuntary termination decree renders Mother's appeal from the goal change order moot, and we dismiss the appeal from the goal change order. *See In the Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020) ("An issue before a court is moot if in ruling upon the issue, the court cannot enter an order that has any legal force or effect.") (citation omitted).

Termination decree affirmed. Appeal from goal change order dismissed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/13/2023

- 14 -